I guess you will inform us how to correctly pronounce that. Scognamillo? Okay. Thank you. I guess you will inform us how to correctly pronounce that. Scognamillo? May it please the Court, representing the plaintiff's appellants, I am Ken Mann, and I announce the statement of my co-counsel, Robert Greene. With the Court's permission, I will be addressing the dismissal of the common law counts and the dura damage issue raised in the answer brief. Mr. Greene will be addressing the California blue sky provisions. I would like to divide the time ten minutes for myself, five minutes for Mr. Greene, and then five minutes for Mr. Shell. All right. You have a clock right there that you can watch. I'll also try to help you. Thank you, Judge. Basically, the trial court held that as a matter of law, persons negotiating in California with successful businessmen have no duty to them. For example, no duty to be truthful. And further held that they're immune, basically, from adverse consequences for their willful or careless fabrication and half-truths, as well as for silence and for the presence of such conduct by their allies. The Court said it had no – they had no fiduciary duty, and that's true, correct? Yes. We concede for appellate purposes that the Shell and Longinati had no fiduciary duty to our clients. And the trial court found that because there was no fiduciary duty, therefore, there was no duty whatsoever at all, no duty in fraud, no duty in negligent misrepresentation or anything else. And we submit that that is not the law in California. Rather, as many states, California has adopted a restatement of torts, from which I've quoted extensively in our briefs. Your Honors, California does not issue licenses to steal by trick. Succinctly, unless the misrepresentation is obvious or apparent on its face, the restatement rule in California law is that there is no duty to investigate regardless of who you are, whether you fall off a turnip truck or you're a Harvard Business School graduate. The victim's reliance on the false statement is justifiable. Unfortunately, the learned trial court found no duty. He took some basic facts. He extended and extrapolated them with assumptions and speculation and held the plaintiffs were barred by his perception of their sophistication from believing in what the defendants told them. And worse, this was not after trial and granting a JNOV. This wasn't even on summary judgment. What if we agreed with you on that point, that, you know, trial court started down the right path, no fiduciary duty, okay, now we know the foundation. Then we look at alleged fraud and misrepresentation, and even crediting that that was made, one would need justifiable reliance. But what if we were to agree with you and say to make a determination on that point you would need a trial? However, the one question that troubles me is, as you keep going down the chain, the logic chain is the loss causation. Would you address that, please? Absolutely, Your Honor. First of all, I submit that it's true, probably it's premature at this point because the fact is the trial court hadn't addressed it yet. Nevertheless, I love it. Well, let me just say that we, you know, we have this principle, particularly on summary judgments, that we may affirm on any ground supported by the record. So it probably would be prudent for you to go there. I'm well aware, and I am prepared to argue it, Your Honor. Okay. We would respectfully urge, number one, that Dura and the prototype model it is concerned with do not apply to this case. And second, we adequately allege loss causation. Specifically, in the Dura model, okay, its focus is on fraud on the market. All the fraud on the market cases don't deal with actual reliance. They deal with implied reliance. Implied reliance on the market, implied reliance on the integrity of the market, reliance on the price that the truthfulness and so forth is embedded in the market price, is the presumption. And therefore, it's the second part of that is that when the implied reliance is nullified by later public correction, public notice of the correction of the falsity that they were presumed to rely on, that the price drop at that point will be, will reflect the actual loss that the person sustained. Well, if we look at your complaint, if we look at the complaint, it's virtually, almost every single item it talks about either looks like inducement kind of reliance or the initial transaction reliance, or when you come to your losses, you're talking almost entirely about the market fail, market reliance. I mean, that's what you're talking about. And this is like Dura in that sense, because your pleadings revolve around the stock fell on the market. And that is, when the truth came out, when the truth came out, the stock fell on the market. How do you get beyond that? Your Honor, that's exactly the point. I appreciate that. First of all, let me separate the market manipulation issues from the specific misrepresentations made to our clients. We do have in the complaint market manipulation issues relating to the market price manipulation that is patterned after the SEC investigation and lawsuit. But I'm not, I'm not focusing on that right now when I'm speaking about Dura. I'm primarily concerned right now with the specific misrepresentations that were made. And that truth never came out in the marketplace. It was never made in the marketplace, okay? In Dura, which involved public announcements about this product and so on and so forth, okay, there was a public notice of that. And later on they found out it's false and they published new notices, okay, and the price dropped. In this case, there were specific private, not public, misrepresentations to our clients. We are going to merge with CMGI. You are going to be a part of this company. You are going to be heading it up. It's going to be partners and teamwork. It's like a joint venture. Don't worry about our ability to expand UVN, the company that you have. We have the cash ability to take it to the next level. We don't have to go for additional financing later on. These are specific and private, one-on-one representations to our clients. And where does it plead that those caused the loss as opposed to caused you to enter in the transaction? Your Honor, they caused the loss because obviously credit, not Credit Suisse, Net Centives didn't have the cash to keep the company going. Net Centives didn't have the ability to expand. Net Centives didn't keep our clients in control of UVN. Those were specific breaches. And Net Centives went bankrupt. That's the loss. The loss is on the specific misrepresentation, not the market price. The fact that Net Centives lied about their ability to go forward had to come. Let's just unpack it a little bit. Let's take the clients that didn't get to be in charge or to be able to assume a position that they thought. They signed employment agreements, correct? They signed a what was represented as a boil plate. Everybody, President on down, signed a boil plate agreement, yes. Well, which told them what their position was, correct? Your President. Yes. So, I mean, they knew that right up front from the get-go. Correct. And now I hear you. You're saying they thought they were going to be something else. They signed this agreement. Now they know they're not going to be something else. But that particular misrepresentation, in effect, was a cause of the bankruptcy. Is that? That's part of it, okay? But they're not suing. This is not a suit for a breached employment agreement or lost employment. Well. It's the fact that they lost the ability to control that company. And they knew, for example, almost upon the closing of the transaction, that there wasn't going to be this side transaction as well, correct? No, Your Honor. That's not correct. Oh, it didn't happen. Your Honor, that's correct. But that doesn't mean fraud. Because a merger does, because the parties, let's assume for the moment that there had been a contract to merge, just like there's a contract to buy or sell real estate. The fact that the closing does not occur down the road does not automatically spell fraud, suspect fraud, suggest a likelihood of fraud in that representation. There's lots of reasons why mergers spell fraud. Well, but here's the representation is we're going to merge with CMGI. Is that the name of it? Yes. Okay. We're going to merge with CMGI. Right. So your clients, presumably there's some transaction reliance in entering into the transaction, thinking, well, that'll be good because down the road things will work out a little better. We'll have, you know, a stronger base. We'll have a different company. The transaction closes. Right. And there's no merger. Correct. And your clients know that, correct? Correct. Okay. But there's no evidence right now in the record as to what they were told and when they were told as to why there was no merger. And that goes into this, you know, when Mr. Green will address it further as far as the statute of limitations on the Blue Sky rule applies. Well, maybe now's a good time for him to step up to the plate and tell us about that. Okay. I just wanted to make sure we were addressed on the Dura issue, though. Dura doesn't know. Well, you're using up his time, so that's your choice. Oh, I'm sorry. Okay. I don't want to do that. Okay. Thank you, Judge. Thank you, Your Honor. I would like to make one additional point about Dura in that the difference between a market fraud case is that the only thing a plaintiff or a purchaser relies upon on a market fraud on the market case is the integrity of the price. There's some representation out there that affects the price. You rely on the price. So the only way to know if a change in that information affects you is by looking back at the price if the news gets disclosed and it declines in response to that. Our situation is different in that we weren't just relying on the price. We allege that they paid more than the market price of this stock on the date they purchased it, based on these individual representations, and that they were locked up for a year as part of that, so all they could do is watch the stock go down. So I think that our representations are different. That because of the haircut? That was part of it, yes. More than the market price for the stock. Pardon? In this transaction, if the stock was selling at X dollars, they paid X plus? Yes, and that was a negotiated amount. Paid? That's strange the way you're looking at it, but anyway. Yes. I feel like they took less. They took less. So the calculation is above the calculation of a per share amount was negotiated. It wasn't the market price as of a date. It was we are assigning a price to your shares that you're getting, something like $53 a share or whatever the number was. It's in the complaint. And it was different than the market price. And then they're locked up. They watch it decline. It crashes. But you said they paid less than the market. I'm confused. Your clients didn't pay less. They took less. Well, I'm not talking just about the haircut. I'm talking about how their price was determined. The price was determined not by the market price on a specific day. It was determined by a negotiated number that the two parties put on that stock. Forget the haircut for a minute. Just we're not like a public buyer who goes up. What's troubling about that is your allegations of harm, your allegations of loss seem to revolve around the market price. The market price fell. I understand. The market had stayed up. We hadn't had the dot-com meltdown and such. I assume your people would be happy as clams except for the fact they didn't have the control they wanted. I think that's true. And I do think we could allege it more specifically if given an opportunity to amend. But I also think we've stated an appropriate case as it is. Let me jump to the California Corporations Code claims, if I may. And really what I'm addressing there is the court did two things I think incorrect that I don't find that any other courts have provided any guidance on. In the California Corporations Code, 25400 claims. Before you get to that because your time is running, could you deal with the statute of limitations issue? Yeah, it's a one-year statute of limitations and that was a two-year period. And first of all, the district court did not rule on this in any way. So what the defendants are asking you to do is in the first impression make a Ninth Circuit ruling as a matter of law without any discovery or facts or opportunity to amend what the application of the statute of limitations is. Secondly, as co-counsel was indicating. But it was argued, wasn't it? In briefing. There was briefing on the issue and the district court just didn't reach that issue because the district court refused. Well, it didn't need to because it went a different route, correct? Which I believe are incorrect. And that this court recently issued a ruling on inquiry notice that it's an issue of fact to be determined by the trial court. Inquiry notice is a factual matter. So deciding it at the Ninth Circuit level on the first instance, I think, would not be appropriate in this case. And as counsel was noting. What's the claim? Is your claim that they didn't enter into the merger? That's part of it. Okay. Let's take that claim. When the transaction closed, it was known that they didn't enter into the merger, correct? I'm not sure exactly what they did know at that point. Wait a second. The transaction closes. Had there been a merger with this CMGI? No. And every day thereafter, there still was no merger, correct? That's right. Right. So I'm having some trouble understanding why, with each passing day, they know there's no merger. If their complaint is that there is no merger, then why haven't they kind of busted the statute of limitations? Well, I have two responses to that. One, first of all, there's a broader claim than just the merger. So I understand we're leaving out the other facts in this discussion. Secondly, because the record needs to have an indication in it as to what the reasons are. If there are representations, for example, as held by the Ninth Circuit in other cases, about the reasons for that merger not having taken place, that would explain a delay. If any number of facts, as we suggested in our reply brief, could explain that as something other than fraud. But those are all hypotheticals. This was argued in the district court. What was the explanation? Presumably the one year was particularly significant because the representation about this potential merger was that you would be getting stock in another company and you would be able to sell it without any long delay in your ability to dispose of the stock. So that the one year period was presumably that the merger would take place at least within one year was absolutely obvious. That's what you claim yourself was significant to you. And it didn't take place. And you knew it and you didn't get the advantage of it. Right. And, yes, at some point, and I'm blanking on it, I can't remember what the arguments were on that point in the district court when it was argued. Because you would have an obligation. I understand there could be facts. You could say, look, they let us down the garden path and they did this and so we thought it was going to close. But then we, you know, they basically were stonewalling us, et cetera. But then it's your obligation to come forward with that, correct? Right. I understand that. And this is a statute of limitations on a motion to dismiss where we didn't amend the complaint at any time to address that issue. So it was difficult to argue in the district court anything beyond what's in the actual complaint itself. Shouldn't you have alleged facts in the complaint since it was obvious that it was time barred just from what you alleged? Shouldn't you have alleged? I mean, this is your third amended complaint. Shouldn't you have alleged facts that indicated why you didn't proceed more quickly? Such as fraudulent concealment? I think we probably should have. Although when you say third amended complaint, we did note in our briefing that the prior amendments were simply to correct the trustee in some other minor issue. It wasn't a litigated. Go ahead. It was in response to motions that had been made to dismiss, wasn't it? I believe at one point it was, yes. Yeah, it was. You might want to save the remaining time for rebuttal. Yes, Your Honor. Thank you. Good morning. I'm Caroline McIntyre, counsel for Appellee John F. Longinotti. I'm going to be addressing the common law fraud claims. Mr. Main, counsel for Reschel, will be addressing the corporation's code sections as well as the Dura causation argument. We do believe that, and the case law supports, that justifiable reliance can be determined as a matter of law where reasonable minds can come to only one conclusion on the facts. And although it's usually and often a factual issue, in this case, the complaints were filed several years ago, and we have a very detailed admissions in the complaints as well as information that the court took judicial notice of. And that included the fact that Appellant John Cresto was an attorney, and he was laterally hired as a partner by Seaforth Shaw in their mergers and acquisitions department. Appellant Galasso was a former CEO of Bank of America and their consumer credit card division. Appellants Scognamillo and Galasso, in their own pleadings, describe themselves. Why don't we get specific? These fellows that you say are bounders, say to them, for example, we're about to have a merger with this other company, see something, with this other company. And we can't tell you the details because, as you as smart businessmen know, you can't be disclosing things like that to other people. So we're about to have this, and it's going down any minute. Everything is wonderful. And you should take that into consideration when we're asking you to have a haircut. Okay? Now, they're not stupid businessmen, but they rely on that. And you're saying, I think, nope, they can't. Correct? We're saying that justifiable reliance is an element of a fraud claim. Sure. As a matter of law, you're saying as a matter of law that they couldn't have justifiably relied on those representations. For multiple reasons, including the fact that they were represented by counsel. And if they had questions about what was being represented to them, or if they wanted those particular facts to be contained in the merger agreement, they could have insisted upon that. They say, look, we need the information. I believe these folks that we can't give you more information. And, by the way, this has to go down really fast. It's got to go down now. Not true. They could have walked away. I understand. But you could have walked away isn't exactly the same as justifiable reliance, is it? Well, I think that goes to their sophistication. They certainly knew they could have walked away because, in fact, they did walk away from the deal at one point. I think the record is clear that they aggressively were represented in this transaction. And, again, they knew enough. If something were that important to them, they should have insisted that it be contained in the agreements. How about the employment part? They say to them, look, you guys come aboard, you're going to keep running your division, and, by the way, you're going to be right at the top of our company giving us information, and we're going to follow your information. And, by the way, I guess allegedly, if they had followed what these guys said, their company wouldn't have gone in the bucket. But never mind. They say, we're brilliant operators, but we're going to follow everything. You can follow what they tell you, and you're going to run your own. By the way, everybody signed this agreement. We all signed this agreement. And they signed it, and it doesn't say that. Okay? Now, why couldn't they justifiably rely upon all these things that I think the CEO and the CFO were telling them? Am I right? That's the alleged misrepresentations, yes, are by the CEO and the former CFO of the company. Well, with respect to the allegations regarding their future roles within the company, Mr. Scognamillo and Mr. Galasso signed written employment agreements, which were before the court, that specifically said employment would be at will. They had integration clauses, which indicated that they could not rely upon any other representations. And then this goes back to their experience. If they thought that any of the representations, alleged representations, regarding their employment were that important, they should have insisted that they be contained in the employment agreements that they signed. Well, being at will is not antithetical to you're going to be running your division, nor is it antithetical to you're going to have important input at the top of our company. Those aren't inconsistent. You can be at will, but it's at will, and if we don't like you, we can kick you out, or for whatever reason we want, we can kick you out. But the longer you're here, you're going to be doing these things. Well, we would submit that it is barred by the integration clause, and to the extent that they thought it was important, it should have been. We're talking about just file reliance, not the integration clause. With respect to those alleged statements, I think they're potentially statements of opinion that would not be something that we rely on. You're going to be running the company as a statement of opinion? You'll continue to run your division as a statement of opinion? To the extent they made representations that they would have important roles within the company, it could be a statement of opinion. And in any event, we do believe it should have been contained in the employment agreement if they thought that that was important to them. Well, wouldn't it have operated to put them on some notice that this particular material fact, the other side, your clients, didn't want to put it in the agreement? I mean, this is a separate question from issues about parole evidence. I mean, this is a fact that's important and material to them, and the other side refuses to put it into the agreement. I believe the record reflects that, that Mr. Schell indicated that they had to sign the agreements as is, that they were not going to make revisions to the agreement, and I believe that should have been an indication. If there was something that they felt should have been included, then they should have insisted that it be included in the agreements that they signed. We believe there are other alleged misrepresentations that fail for multiple additional reasons. I believe each of the alleged misrepresentations fail because appellants do not allege, as they must, that the statements were false. Appellants do not allege, as they must, that either Mr. Longinotti or Mr. Schell knew that the statements were false when made. With respect to the statements regarding the 800-pound gorilla and the completed transactions controlling the marketplace, which neither Mr. Schell nor Mr. Longinotti are alleged to have even made, those are statements of opinion that could not be relied upon. Finally, with respect to the alleged statement regarding the CMGI merger, we believe it's unreasonable for appellants to have relied on that statement, which, again, was a potential future transaction. And appellants admit in their reply. Wouldn't that be, when you get to unreasonable reliance, that just shouts fact question to me. Whether it was unreasonable or not would depend on the circumstances, the nature of the negotiations, what's the situation in the market, what's the status of CMGI, what's the history. That all goes to, I don't know how you can decide that as a matter of law. Well, I think it's telling that appellants themselves in their reply brief have said, and counsel has argued today, that the mere fact that the CMGI merger did not occur does not suggest fraud. There are many reasons why mergers, takeovers, and even cash tender offers are not ultimately consummated. They've admitted that in their briefs. I think they've admitted that in argument today, and the complaint is completely devoid of any evidence that there was any fraud or any false statement associated with the potential CMGI merger. Well, I thought that, as I read the complaint, that was one in a series of things that led to the financial undoing of the company. Correct? I mean, isn't that, you don't have to agree that that is in fact what happened, but that's what their allegation is, I think. They've alleged multiple misrepresentations. I don't believe they've alleged that the potential CMGI merger resulted in the undoing of the company. I don't believe they have any facts that would support that allegation. I'd like to turn the question, turn the argument over to my co-counsel. All right, thank you. Thank you. Good morning. Stephen Main appearing on behalf of Apelli Westshell III. I'd like to address primarily the Dura issues and also the California Code claims, including the statute of limitations. But at the outset, I want to offer a brief comment on CMGI. The CMGI case is interesting in that it is one of the predicates for the fraud claims, and now we're hearing that we're unsure whether or not it didn't go forward for a benign reason. Understand, there's an affirmative allegation of fraud here. And I'll come back to the statute of limitations. As it relates to CMGI, what we do know is that there was no merger, and what we do know is that the stock did not become freely tradable. We knew that, and we know that in March of April of 2000. You will not find in the complaint any new fact occurring between March April of 2000 and the filing of the complaint in March of 2002, any new fact that would be a trigger for the belief that a fraud had occurred with respect to the CMGI representations. There was no new information. And what the plaintiffs attempted, the appellants here tried to do is shift the burden of the responsibilities to CMGI. Well, they didn't tell us that there was good reason. Was there any inquiry put as to why CMGI didn't occur? No. They took no steps. And coming back to, and we'll come back to this statute of limitations issue, the problem is, of course, they filed an Arizona State court, Arizona State court. We removed the Federal court. They had Arizona State claims. First Amendment complaint added 10b-5 claims, which then disappeared out of a subsequent version. But significantly, I suspect they filed a day before the expiration of the 2-year period, and I would suggest that Arizona State law has a 2-year statute of limitations. But they only have themselves to blame. They only have themselves to blame for that outcome because the merger agreement had a choice of law provision and a venue provision, venue right here in San Francisco. And what they were trying to do is keep this case in the backyard for whatever reason. They certainly did not initially want to go to Arizona, the Federal court, for whatever reason. I'm not sure. But if you look at the complaint, you will see that the complaint incorporates wholesale material allegations from the IPO litigation in the Southern District in New York. And what they did was they were trying to figure out a way to cobble together their own misfortune with respect to net incentives with the IPO litigation. But if you look at the briefs and you look at the complaint, it's all about it. It's all about the IPO litigation. For whatever reason, they didn't want to get sent back to New York with that case. And that's only speculation, not before the court, the lower court. But anyway, as to CMGI, all the operative facts of which they had new were present in March, April of 2000, and no new facts are pled, and no facts are pled that would excuse their failure to file timely under California's one-year statute of limitations. Because, in fact, they were in the wrong place to begin with. They filed in California. I mean, they filed in Arizona rather than California, as they should have. We focused on the state law area. We've been focusing on the CMGI merger. Are there other state law claims that are subject to the one-year rule?  All the California corporations code claims, and that's part of it. But, I mean, so in other words, I mean, they have quite a large complaint. So every one of these claims in terms of position in the company and those other claims also are under their California code claims, correct? Well, they are alleging both the common law fraud claims, but they're also alleging the California corporations code claims. And the California, and they've gone through a really, a tortured reading of the statute to arrive at where they were. And let me just, if I could respond to the count, because I know my time is limited, but understand that there is, in order to have liability under 25-400, all right, there's 25-400, 25-401. 401 requires privity. There's no privity here. Shell and Longinati didn't sell. Stop. So they had to rely on 25-400 in order to have a civil cause of action under 25-500. So how did it get there? They didn't want to ensnare Net-Cenas into this case because it was bankrupt. You will not find any pleadings that Net-Cenas was a primary violator of the securities laws as alleged in this case. They wanted to focus on Shell and Longinati as being primary violators so that they could pull them into 25-400 and then leap forward to 25-500 and have their civil action. They, to get there, they had to rely on 25-403. A criminal statute passed in 1998 with no corresponding, no corresponding civil right of action. None. And the legislature, in all its wisdom, didn't feel that was necessary. What clearly was happening in 403 was to make sure that the control persons, because remember, criminal statutes, corporations don't go to jail. Obviously, what the corporation wanted, the legislator wanted to do. They wanted that the control persons to be subjected to criminal liability under 25-400. Very simple. As distinct from relying on ADER and a better and controlled person liability, which requires that there be another primary violator. Another primary violator. And that is the, that is why there, there was no accident. Here, that the plaintiffs omitted their 25-504 and 4.1 claims here. There is no suggestion, there should be no suggestion that they didn't know about that statute, because if you look in the complaint, they sued CSFB under 25-504.1. So they knew the statute was there. The flaw, their problem was that they had made net incentives. They didn't want to make net incentives the primary violator. They had to draw Schell and Longinati into primary violator status through this tortured reading and just flat wrong reading of 403, 25-403. And so they couldn't rely on the ADER and a better statutes because they had already identified Schell and Longinati as primary violators. And in order to have a 504 or a 504.1 violation, it's aiding and abetting, controlling, and it's joint and several civil liability. The whole predicate of those statutes is that there is somebody over there who is a primary violator and you aided them, you assisted them, you assisted them, and you controlled them. So the, as to the California Corporation of Clothes Claims, the plaintiffs found themselves in a, in a, in a soup of their own making. Because of their tortured effort to avoid bringing net incentives that bankrupt into the entity, they didn't want to call them a primary violator and just then make it all the, make all these aiding and abetting claims. So in, in fact, there is no, there is no justification for bringing Schell and Longinati into the corporation code violations, none whatsoever. There is no privity. And they weren't aiders and abettors or control persons of a, of a party as to which there had been a pleading of a case showing that they are the primary violator. Very important issue. If I could come back briefly to the statute of limitations issues generally, because the, the effort, the suggestion has been, gee, under Devaney, under Devaney you know, these motions, you know, people alluse on, on statute of limitations, no right to amend after discovery, after discovery. The problem here, the plaintiffs were in total control, total control of the knowledge necessary to file a claim. In fact, in March of 2002, they knew enough to file a claim. So what did they learn in the interim? Nothing. All they knew was the stock had gone down. All they knew was the stock had gone down. These claims are terribly, clearly time-barred. They were the, the product of their failure to file in the wrong court, get into California the first time and start thinking about California statutes. And they also got into this mess because they didn't want to bring net sentence in as a primary violator. Let me get to Dura-Fiber, because I, if I could. I just touched on it. Very shortly, yes. Thank you very much. The Dura-Fiber issue is, I would like to focus on one element of, I have my notes here. There is an allegation in the complaint, or I mean in the brief, that essentially says the plaintiffs, and this is at page 22, and this is the reply. Plaintiff's economic loss is not that they purchased securities at an inflated price. Rather, their economic loss in part was a decline in the value of the net sentence securities that was the direct result of the misrepresentations that the market price was fair, not a representation that we were going to do CMGI, not a representation that we were going to be hired as some senior level employee, even though, by the way, there is not even a recital in the employment agreement to that point. And the price was fair and adequate when, in fact, the price had been manipulated. This is page 22, and that is the core of the case. Interestingly enough, there is no nexus, none, between Shell and Longinati and that loss. There is no allegation linking Shell and Longinati to the CSFB defendants. They are the market manipulators. What we are presented with is some speculation that, gee, maybe we knew. Maybe we knew. Not that we didn't know. Maybe we knew that this was going on. But, gee, with discovery, we could find it out. But the point is that under Durafiber, very important to understand, there is no loss causation established based on that statement. And there is nothing in the pleadings, in the pleadings, which this Court reviews de novo, the ruling on the pleadings, does it state a claim, there is no loss causation connection, nexus stated between Shell and Longinati and the grovelment of this complaint, which was the market manipulation. Thank you. Sotomayor, Your Honor, to the extent I get to address everything they said, I'd be glad. But we've got extensive briefings. You've got a minute to tell us your most important point. Your Honor, first, I'd like to correct opposing counsel. He cites part of our reply brief. He totally ignores page 26, where we talk about, in addition to damages attributable to market manipulation, are the damages sustained and awardable under the California jury instructions. From the fraudulent misrepresentations made regarding the Phantom merger with CMGI, the 800-pound guerrilla marketing dominance, which I cited case law that that's a fact, that's a representation of fact, not just an opinion, the ability to expand. Scalia, you would have entered into this. Suppose they had never made a representation with respect to this potential merger. Right. You would have still entered into this transaction. You would have just not taken a $5 million haircut. We would have. They were ready to walk away. I mean, when they were first told about that. But if they had not made the representation and they hadn't asked for a $5 million pay cut, you would have entered into this transaction. Correct. And it would have been the other way around. You would have gotten more money, and you would have still suffered, in the end, the same loss. Your Honor. Everything else, everything else would have followed. Well, except, Your Honor, that there's still the misrepresentation that they had the cash to keep the business. That's irrespective of CMGI and so on and so forth. We have the cash. Trust us. We have the cash. Now, you shouldn't have trusted. You shouldn't have relied on our telling you to trust us. And that's – it's public policy, Your Honors. Dura has a public policy not to let people who have implied reliance get a windfall. What about people that have actual reliance? Is there no public policy that victims should have the ability and the right to rely and be compensated when they do have losses? I submit there is. They gave up a company. It's not just cash. They gave up a company, the opportunity to grow that company based on specific misrepresentations of fact that we have the cash to keep this business in play. That's more than – you know, Dura was concerned about public policy of defendants being sued in class actions and so on and so forth. This is not a class action. This is four individuals that had their own baby, and they gave it away based on false – specific false eyeball-to-eyeball misrepresentations that were never corrected in the marketplace. We never told in the marketplace. That's the Dura scenario, is public market is told one thing, public market is later told that was wrong and the price drops, and that's the measure of loss is when the price drops after the public correction of a previous thing. We don't have that here. Thank you. I thank both or all counsel for your arguments this morning. The case just argued is submitted and we're adjourned. All rise.
judges: Fernandez, McKeown, Korman